[Crim. No. 5114.   Second Dist., Div. Three.   June 21, 1954.]

THE PEOPLE, Respondent, v. JAMES BARTLEY CAR-RIGAN et al., Defendants; LEONARD DANIEL MAHAN, Appellant.

R. E. Montague for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

SHINN, P. J.—Leonard Daniel Mahan, James Bartley Carrigan and Don Eugene Hall were charged by information with the offenses of kidnaping for the purpose of robbery, and with armed robbery. They were found guilty by a jury. Mahan's motion for a new trial was denied and he appeals from the judgment and the order denying him a new trial.

Appellant says "The record in the instant case may be likened to a strange and fascinating tapestry of intrigue and violence which upon cursory viewing appears to have some quality of overall accuracy, but which, upon closer scrutiny is shown to contain threads which distort the scene to the extent that the work is valueless." This is appellant's euphemistic approach to the argument that the testimony of the prosecuting witness was fantastic to the point of incredibility; hence the evidence was insufficient to justify the verdict. Because the argument, although misguided, is made with apparent sincerity, we shall accord it more attention than it would otherwise merit.

██ There was evidence of the following facts: Eugene Courtier was 27 years of age, married and living with his wife and three children at Edwards Air Force Base in Los Angeles County where he had been employed for seven years by North American Aviation Company as a technician; at about 2 p. m. Courtier was driving a Mercury coupé northward toward Lancaster; defendant Carrigan signaled for a ride and was picked up; after traveling 15 or 20 miles Carrigan drew a gun and upon his orders Courtier turned up his rearview mirror, slackened his speed and eventually turned off the main highway to a point on a dirt road not in view from the highway; Carrigan took Courtier's wallet containing $5.00; appellant Mahan approached on foot; upon orders Courtier lay face down on the ground; there was talk of killing him; a shot was fired into the ground close to his head; he agreed to sell his captors his automobile; they started toward Lancaster in the car; defendant Hall had entered the car; Courtier lay on the floor; near Lancaster he was allowed to drive; they drove to Stranske Motors where Courtier agreed to sell the car for $2,000; he received $500 and a promise of the balance the following day; Carrigan and Hall were present during these negotiations; the three left Stranske Motors in a cab driven by a woman; upon Carrigan's demand Courtier gave him the $500; they went to a bar where Courtier and Hall each had a drink; Carrigan was absent for a short time; when he returned the three walked

down the highway; a shirt was picked up and tied over Courtier's eyes; a car pulled up driven by Mahan and the men entered it; Courtier, blindfolded, lay on the floor; they drove to Courtier's home; the blindfold was removed; Carrigan and Mahan drove away; Courtier rang the doorbell, his wife appeared and the men entered, Hall holding a gun at Courtier's back; Courtier said he had been held up; Hall ordered Mrs. Courtier and the children into a bedroom; shortly thereafter Mrs. Courtier came out and prepared coffee; Hall came into the kitchen and fried eggs; Carrigan and Mahan returned and joined the others in coffee, eggs and toast. A Captain Carnely came by to tell the Courtiers he was leaving on assignment; Courtier, with a gun on him, held by Carrigan, but out of sight of Carnely, told the latter his wife and children were ill; Carnely left. Courtier's father phoned and with a gun held on him Courtier talked with his father; Mahan brought in a suitcase, took a shower and went to bed; the Courtiers endeavored to get some sleep but returned to the living room where music was played. Mrs. Courtier and the three defendants had a card game and Mrs. Courtier danced with Carrigan. The following morning Carrigan, Mahan and Courtier returned to Stranske Motors; Hall stayed at the Courtier home. The three men stopped for breakfast; Mahan remained to finish his breakfast; Carrigan and Courtier went to Stranske Motors when Courtier received a check for $1,251.02 payable to him; the two went to the bank where the check was cashed by Courtier and the money given to Carrigan outside the bank. They joined Mahan at the drugstore, got into his car and drove a short distance when the money was divided between Mahan and Carrigan. They returned to Lancaster, gave Courtier $70 with which he bought groceries; after stopping at a service station where Mahan had left a tire to be fixed they returned to the Courtier house; Mahan and Carrigan returned to the service station, got the tire, had the car lubricated and again came to the Courtier house. In the latter part of the afternoon the three defendants left, and Courtier reported the matter to the Provost Marshal's office at Edwards Air Force Base.

Mrs. Doris Courtier corroborated her husband's testimony with respect to all of the occurrences at their home. Neither she nor her husband had known any of the defendants. Both testified in intimate detail and at great length. We have given only a synopsis of their testimony. It was replete with assertions that one or more of the defendants at all times were

in possession of a gun which was exhibited throughout, accompanied by threats of violence if the Courtiers offered resistance. Courtier testified that he was in constant fear of the defendants and that he did not dare to make an outcry or endeavor to escape. Courtier's car was insured. The three defendants testified at the trial. They did not deny getting the car as related by Courtier but accused him of joining with them in a conspiracy to swindle the insurance company. Although they did not deny possession of a gun, and Mahan admitted having fired it while the four men had stopped, as Courtier testified, they denied having threatened Mr. and Mrs. Courtier with the gun or otherwise. The elaborate scheme, they testified, was planned beforehand, at the suggestion of Courtier, who was to get half the proceeds from the sale of the car and give half to the defendants. Mahan testified that he and Courtier had planned the details of the alleged holdup. Carrigan and Hall each made statements to the police after their arrest to the effect that they had joined Mahan in a plan to hold up a motorist on the highway, and they did not implicate Courtier in the scheme.

Appellant contends that the testimony of Mr. and Mrs. Courtier was so improbable and absurd as to be wholly unworthy of belief. He does not in his brief make any reference to his own testimony concerning the claimed conspiracy to defraud the insurance company. There was good reason for ignoring it. In comparing the account of Mr. and Mrs. Courtier of their encounter with defendants with that of appellant, it will be found that the latter contains considerably more than the former that challenges one's credulity. It was more reasonable for the jury to believe that Courtier was actually robbed of his money and his car than that he agreed to pay the defendants a large sum for engaging in a simulated robbery. The fact that defendants, by their own admissions, engaged in criminal activities, would indicate that they were in great need of money and indifferent as to the means by which they might acquire it. Courtier had no such need or motive. There was ample evidence to support the verdict.

In the courtroom, during the trial, Courtier and his father assaulted appellant; struck him and knocked him down. Court had adjourned and the jury had been excused. Defendants offered to prove the circumstances of the affair to the jury and requested that the jurors be questioned whether they were present or had read a newspaper account of the

incident. They also moved for a mistrial. Their offer was refused by the court and their motions were denied. It is contended that the assault tended to intimidate appellant. His subsequent testimony refutes this contention. It is claimed the attack was evidence of Courtier's animosity toward appellant and thus tended to weaken his credibility. The prosecution itself proved his animosity and he had not denied it.　　　It was not error for the court to fail to instruct the jury, on its own motion, to disregard any account of the courtroom incident which they may have read in the newspapers. The case was tried without error and the verdict was justified by the evidence.

The judgment and the order denying appellant's motion for a new trial are affirmed.

Wood (Parker), J., concurred.